Filed 8/14/20  In re A.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E074249 |
| Plaintiff and Respondent, | (Super.Ct.No. J274670) |
| v. | OPINION |
| E.T., et.al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant, E.T.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant, M.B.

1

Michelle D. Blakemore, County Counsel, David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

## I.  INTRODUCTION

Appellants, M.B. (Father) and E.T. (Mother), are the parents of A.B., a child born in August 2016.  The parents appeal from the October 1, 2019 orders denying their petitions for further reunification services for A.B. (Welf. & Inst. Code, § 388[1]) and from the October 30, 2019 orders selecting adoption as A.B.'s permanent plan.  (§ 366.26.)

In this appeal, Father claims the juvenile court erroneously failed to recuse the San Bernardino County Children and Family Services (CFS) and its attorneys, the San Bernardino Office of County Counsel (County Counsel), from the case based on a conflict of interest involving A.B.'s caregiver.  Father *withdrew* his motion to recuse CFS and County Counsel from the case and transfer the case to another county.  Thus, the court never ruled on Father's recusal motion.  The court subsequently denied a more limited motion by A.B.'s counsel to screen certain CFS employees from A.B.'s case, but that motion did not ask the court to recuse the entire offices of CFS and County Counsel from the case.  Thus, we conclude Father has forfeited his claim that the court erroneously refused to recuse CFS and County Counsel from the case.[2]

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

[2]  Mother joins Father's claims, and Father joins Mother's reply brief.  (Cal. Rules of Court, rule 8.200(a)(5).)  We consider each parent's claims to the extent they may benefit both parents.

2

Both parents also claim that the juvenile court (1) abused its discretion in denying the parents' section 388 petitions for further reunification services for A.B., and (2) erroneously failed to find that the parental benefit exception to the adoption preference applied. (§ 366.26, subd. (c)(1)(B)(i).) We find no merit to these claims.

## II. FACTS AND PROCEDURE

A. *Background*

The family first came to the attention of CFS in June 2017. In searching the family home in connection with a stolen vehicle that had been found at the home, law enforcement officers found 20 grams of methamphetamine, including 17.3 grams under a bed in the master bedroom. The methamphetamine was "easily accessible" to 10-month-old A.B., and the parents were arrested for child endangerment. CFS opened a voluntary family maintenance plan for parents.

The parents' family maintenance plan was open from September 8, 2017, to January 23, 2018. To ensure A.B.'s safety and avoid his removal from parental custody, the parents agreed to participate in the plan, which included substance abuse treatment and drug testing, Narcotics Anonymous (NA) meetings, parenting classes, child abuse prevention classes, and individual counseling. The parents did not complete the plan. In October 2017, Mother was "dropped" from her substance abuse treatment plan due to poor progress and attendance. Father failed to enroll in any services, and between late 2017 and early 2018, each parent failed to participate in on-demand drug testing.

On January 23, 2018, CFS detained A.B. pursuant to a detention warrant and placed him with his paternal uncle, E.B., a former CFS social worker. The parents had

3

asked CFS to consider E.B. for A.B.'s placement. On January 25, CFS filed a dependency petition alleging jurisdiction because the parents had substance abuse problems, engaged in illegal activity, and stored "a quantity" of methamphetamine in their home accessible to A.B. (§ 300, subd. (b).)

At a January 26, 2018 detention hearing, Mother was represented by appointed counsel, and Father was represented by privately retained counsel, Valerie Ross. Ms. Ross asked the court to transfer the case to "another county" because CFS had a conflict of interest with Father's "close family." The court advised Ms. Ross that a written motion to transfer the matter would have to be filed and proceeded with the hearing. The court detained A.B. in CFS custody, ordered predispositional services and supervised visits for the parents, and set a jurisdiction and disposition hearing on February 16.

On February 14, 2018, CFS reported that, during the search of the parents' home in June 2017, indicia of methamphetamine sales were found, including several glass pipes and a scale inside a black case beneath the bed in the master bedroom, along with approximately 17.3 grams of suspected methamphetamine in a baggie, and "more small baggies with white crystalline substances," weighing approximately 1.2 grams.

On January 31, 2018, CFS interviewed Mother and Father. Mother claimed that the methamphetamine found during the June 2017 search of the parents' home belonged to a roommate who had been using drugs while living in the home. Mother was born in January 1980, began using marijuana at age 14, and admitted using methamphetamine "off and on" since she was age 15 but denied using any methamphetamine since her July

4

2017 arrest. Following her arrest, she pled guilty or no contest to a misdemeanor charge of child cruelty.

Father was born in 1984 and denied having any current medical diagnoses or prescribed medications. When he was in his 20's, he was diagnosed as bipolar and was twice placed on a section 5150 hold. Like Mother, Father claimed that the methamphetamine found during the June 2017 search of the parents' home belonged to a roommate. In 2017, he pled no contest to possessing a stolen vehicle, was placed on probation for three years, and had to complete a work-release program.

Father said he began using cigarettes and marijuana when he was between five and eight years old. He tried cocaine once or twice and had "occasionally" used methamphetamine, but he claimed he had not used *any controlled substances* in several years. He did not participate in substance abuse services through the parents' voluntary maintenance plan because he felt he did not need the services. He admitted that Mother had "struggled with substance abuse" and that he "should have been more aware of her usage." In 2018, Mother was still married to R.T., although she and R.T. had separated in July 2015. R.T. reported that Father was a drug dealer and that Mother and Father met through their substance abuse. R.T. was not A.B.'s biological father.

CFS interviewed E.B. on February 7, 2018. E.B. had "numerous concerns" about the parents for years and had reported them to law enforcement and the child abuse hotline. According to E.B., Father was a drug dealer, and the parents met when Mother and R.T. would meet with Father and Father's former girlfriend to buy drugs. Mother

5

lost custody of an older child due to her heroin use.[3]  Father was bipolar and had used drugs since his childhood.  Father had been an inpatient at a psychiatric hospital on four occasions, including for three months in 2010 due to his attempted suicide.  Father had also been fired several times for stealing from employers to support his drug habit and had a $26,000 judgment against him for "trash[ing]" his rental home in 2017 before he and Mother were evicted from the home.

In February 2018, the parents were referred for individual counseling, parenting classes, and individual substance abuse assessments.  On February 15, CFS filed an amended petition, which added an allegation that Father had "ongoing mental health problems" that adversely affected his ability to parent A.B.

B.  *Father's Recusal and Transfer Motion and A.B.'s Related Motions*

On February 16, 2018, Father's counsel, Ms. Ross, filed a motion to recuse CFS and County Counsel from the case based on an alleged conflict of interest they had involving E.B. and to transfer the case to a neighboring county.  At the time of the scheduled jurisdiction and disposition hearing on February 16, Mother asked the court to remove A.B. from E.B.'s care and place him with the maternal grandmother.  At Mother's request, the court set a March 21 mediation to discuss A.B.'s placement, the

---

[3]  Mother admitted that her first husband, J.V., had full custody of their 10-year-old child.  Mother later married R.T., but Mother and R.T. had a 19-year-old son, J.T., who was born before Mother married J.V.

amended petition's allegations, and visitation.[4]  The court set an April 2 hearing on Father's recusal and transfer motion and a contested jurisdiction and disposition hearing on April 25.  Both hearings were ultimately continued to August 13, 2018.

In support of Father's recusal and transfer motion, Ms. Ross submitted her own declaration averring that she was representing Father in A.B.'s dependency case and was also representing Father's brother, E.B., in a "whistleblower" civil case against CFS and the County of San Bernardino (the County), filed in federal district court as USDC Case No. 5:16-cv-01756-JGB-SP.  Ms. Ross claimed that the County and CFS had a conflict of interest involving E.B. that prevented them from treating Father fairly in A.B.'s dependency case.

Ms. Ross alleged that, in 2013, E.B. was "a well-respected social worker" for the County when he reported to CFS management that CFS had been allowing children to be placed in an unsafe and unsanitary foster home even though the home had been decertified some 13 years earlier.  The County tried to "cover up" E.B.'s "discovery of longstanding, gross negligence" by CFS in allowing children to continue to be placed in the foster home.  CFS, working with County Counsel, tried to discredit an investigation involving the foster home that E.B. had completed, by saying that E.B. had exaggerated the condition of the home and lied in a detention report.

---

**4**  At the March 21, 2018 mediation, each parent agreed to participate in individual counseling, parenting classes, substance abuse treatment, and drug testing.  No agreement was reached concerning jurisdiction, A.B.'s placement, or visitation.  At the mediation, both parents were requesting that the maternal grandmother be considered for A.B.'s placement.

Ms. Ross alleged that CFS instructed another County social worker and "J/D writer" in the foster home case, Mary Anna Whitehall, to "submit photos" of the home to the court, which had been "doctored by a CFS assistant director," and "to remove allegations" E.B. had made concerning the home. (See *Whitehall v. County of San Bernardino* (2017) 17 Cal.App.5th 352, 357-358 [describing Ms. Whitehall's "whistleblower" complaint against the County along with her own and E.B.'s roles in the foster home case].) In sum, Ms. Ross claimed that Father believed CFS and County Counsel would not treat Father fairly in A.B.'s case, and Father *"fear[ed] that [A.B.] [would] be removed from [E.B.'s] care during the pendency of this matter [based] on another false allegation against [E.B.]"* (Italics added.)

Counsel for A.B. filed a response to Father's motion, joining the motion and asking the court to grant it and transfer A.B.'s case to "the most appropriate neighboring county." A.B.'s counsel argued that Ms. Ross's declaration showed by a preponderance of the evidence that CFS and County Counsel had a conflict of interest involving E.B.'s and Father's family that would interfere with their ability to objectively carry out their duties in A.B.'s dependency case. (See § 16513.5.) A.B.'s counsel noted that Ms. Ross's declaration implicated "multiple" CFS social workers, CFS management personnel, and persons in County Counsel's office.

County Counsel filed opposition to Father's motion, arguing that neither CFS nor County Counsel had a real or apparent conflict of interest with E.B's and Father's family. County Counsel noted that Riverside County had "performed the emergency assessment that resulted in the recommendation to place" A.B. with E.B., and that Riverside County

8

would also be conducting "the full Resource Family Approval assessment" of E.B. Father cited no authority to support his motion, and, at the detention hearing, the court noted that Riverside County had already declined to voluntarily accept a transfer of A.B.'s case.

Through County Counsel, CFS filed its own opposition to Father's motion. CFS noted that E.B. was its "primary source of information" in its investigation of A.B.'s case, and for that reason Father "should have been more afraid of what his brother [E.B.] was going to say as opposed to what CFS was going to do with the information" that E.B. provided to CFS concerning Father. CFS also pointed out that, at the detention hearing, no one claimed that CFS was being "unfair or biased" against Father in its handling of A.B.'s case.

At the scheduled April 2, 2018 hearing on Father's motion, the court relieved Ms. Ross as Father's counsel and appointed new counsel for Father, after Ms. Ross declared that she had a conflict of interest in representing Father. The court continued the April 2 hearing to April 20, noting that it was not clear whether Father's motion would proceed given that Father had new counsel. Then, on April 20, A.B.'s counsel declared a potential conflict of interest (§ 317) and the court appointed new counsel for A.B. Also on April 20, the court advised all counsel "to reevaluate which motions and on what factors [the motions] are going to be going forward," and that the court would not be considering the declarations of any attorneys, including Ms. Ross, who were no longer in the case. The court set a further "motion date" hearing on June 14.

At the June 14, 2018 hearing, Father's new counsel withdrew Father's recusal and transfer motion, telling the court, "We're withdrawing [Father's] motion to transfer out. [Father] does not want that to happen." The court withdrew A.B.'s "prior motion," or response and joinder to Father's motion, noting that A.B.'s new counsel had since filed a "narrower motion" asking the court to screen from A.B.'s case any social workers and supervisors who were parties or potential witnesses in E.B.'s civil suit against the County and CFS. (§ 16513.5.)

County counsel and CFS filed identical oppositions to A.B.'s new motion, arguing that section 16513.5 authorized the court to "remove" but not to "screen" social workers from cases; any removal had to be based on an "actual" rather than a "potential" conflict of interest; and A.B.'s counsel had not demonstrated any actual conflict. On August 13, 2018, following a hearing, the court denied A.B.'s new motion, without prejudice. The court noted that there had been "no concern" regarding how CFS social workers or County Counsel had handled A.B.'s case since its filing, but if there was any reason to believe any social workers were biased in the case, the court would be "open to hearing about the specifics" of any such bias.

C. *Jurisdiction and Disposition (August 13, 2018)*

The court held the jurisdiction and disposition hearing on August 13, 2018, immediately after it denied A.B.'s counsel's new motion to screen unspecified CFS social workers from the case.

1. CFS's Further Reports

On August 9, 2018, CFS reported that the parents had been "extremely inconsistent" in participating in their services since February 2018, despite having been given "countless resources, information, and assistance." The parents continued to deny engaging in substance abuse and blamed others, including E.B., for A.B.'s removal from their custody.

The parents were referred to substance abuse programs, individual counseling, and parenting classes on February 13, 2018. On February 28, they missed their intake appointments for their individual counseling, claiming they did not know they had appointments that day. They enrolled in parenting classes on February 28, after the social worker contacted them, and in March they were enrolled in substance abuse programs. Mother tested positive for methamphetamine at her "rehab facility" on March 26 but denied using the drug and implied that CFS, the rehab facility, and the drug testing facility were colluding against herself and Father.

From around April 9, 2018 to April 26, 2018, Father was in custody after he turned himself in in lieu of completing his work release program. On April 2, Father submitted a drug test specimen that was rejected as outside the acceptable temperature range. Father failed to drug test during the rest of April but tested negative for drugs on May 12, May 26, and May 30. By the end of May, Father had only attended three of his eight counseling sessions.

Mother tested negative for controlled substances on April 11, 2018, May 12, May 23, and May 26, but failed to test on May 30, June 7, June 14, June 22, and July 6.

Mother attempted to test on July 27 and August 2 but "there was a complication at the testing facility" and she was unable to test on those days.

Around June 12, 2018, Mother reported that she and Father were no longer together and requested separate visits with A.B. It was reported that Father caught Mother having an affair and the two of them engaged in an altercation. But, on June 14, the parents visited A.B. together and denied engaging in any altercation. The parents had a history of canceling their visits with A.B. and ending the visits early.

On June 20, 2018, the paternal grandmother (PGM) reported that Father was hospitalized following a June 19 suicide attempt. The PGM reported that Father was bipolar and had depression; he and Mother fought after he allowed Mother to return to his home; and as a result, he attempted suicide. Mother told Father to "go kill himself" and he attempted to do so. It was also reported that Mother had been with a friend of Father's who was a drug addict and a drug dealer; Mother and the friend were stealing and selling things to buy drugs; and Mother was asking about heroin and using "fake urine" for her drug tests.

On July 3, 2018, Mother reported that she and Father were still together and asked about continuing their services in Whittier, where she and Father were planning to relocate. Mother denied using fake urine for her drugs test and denied using any controlled substances. Father again failed to drug test on June 14, June 19, June 27, and July 11. On July 11, the parents asked to participate in a Child and Family Team (CFT) meeting with CFS, and the meeting occurred on July 18. At the meeting, the parents were given referrals for services in Los Angeles County. On July 18, Father went to a

12

drug testing facility but failed to comply with its protocols and left the facility without testing. He was unable to test at another location later that day because his test had been canceled.

The parents canceled an August 1, 2018 visit with A.B., saying they did not have enough gas to get to the visit though they had failed to obtain a gas card. By August 7, the parents were no longer enrolled in parenting classes; Mother had an August 9 intake appointment at another substance abuse rehab facility, and Father had yet to contact CFS to discuss his hospitalization or his services.

   2. The Jurisdiction and Disposition Hearing

At the jurisdiction and disposition hearing on August 13, 2018, the parties agreed to amend the "b-7" allegation of the amended petition to allege that Father had "untreated bipolar disorder and depression issues," rather than "ongoing mental health problems," and to dismiss the "b-6" allegation that, on June 24, 2017, Father was found to be "storing a quantity of methamphetamine" within A.B.'s reach. Father submitted on the other allegations against himself. The court sustained the "b-1" through "b-5" allegations, namely, that each parent had an ongoing substance abuse problem that impaired their ability to care for A.B; that each parent engaged in illegal activity that placed A.B. at risk, and that, on June 24, 2017, Mother was found to be storing a quantity of methamphetamine within A.B.'s reach.

Regarding disposition, the court declared A.B. a dependent; found that Father was A.B.'s presumed and biological father,[5] removed A.B. from the parents' custody, and ordered reunification services for each parent. The court also ordered a psychological evaluation for Father at CFS's expense and also authorized a psychiatric evaluation, if necessary or recommended. The court authorized the parents to have separate supervised visits with A.B. but ruled they could have joint visits by "approval packet" if they were "compliant with their services." Neither parent asked to change A.B.'s placement with E.B.

Although Mother had completed her individual counseling, the court concluded that another individual counseling referral for Mother was appropriate and also authorized joint therapy for the parents "as appropriate." The court ordered both parents to drug test on August 13, 2018.

The court scheduled a six-month review hearing for February 13, 2019 (§ 366.21, subd. (e)), but the hearing was continued to April 4, 2019, because the parents contested the termination of their services. Given the timing of the jurisdictional hearing, the April 4 hearing was a 12-month review hearing. (§ 366.21, subd. (f).)

D. *Termination of the Parents' Services (April 4, 2019)*

As of April 4, 2019, the parents were still in a relationship and were living together in a hotel in Whittier. The parents had completed parenting classes and were enrolled in substance abuse programs and individual counseling. CFS reported that their

---

[5] DNA tests showed that Father was A.B.'s biological father.

participation in their substance abuse programs and counseling had been sporadic and inconsistent. Thus, at the April 4, 2019 review hearing, CFS recommended terminating the parents' services and establishing a permanent plan of adoption for A.B.

CFS opined that returning A.B. to the parents would not be in his best interests because the parents had neither fully completed nor benefited from their case plans, did not have stable housing, were not financially stable, and had not shown that they were living a sober lifestyle as indicated by their multiple missed drug tests.

CFS's reports showed that Mother enrolled in a new substance abuse program on November 19, 2019, and attended 17 of 60 group sessions through March 28, 2019. Father enrolled in a substance abuse program on January 18, 2019, and attended 14 of 30 group sessions through March 28. Although, through March 28, both parents had multiple negative drug tests, both also had multiple "no shows"; one positive test for methamphetamine, and one diluted test.

Additionally, Father had not completed his court-ordered psychological evaluation and told CFS that he would find his own doctor to perform the evaluation. He did not show up for an intake appointment on September 17, 2018, that CFS arranged for him, and he failed to appear for a December 20, 2018 evaluation that he arranged with his own psychologist.

During the review period, the parents had separate, supervised visits with A.B. and did not progress to joint or unsupervised visits. The supervised visits went well; A.B. was "very happy" to see parents and had "a good bond" with them. A.B. remained placed with E.B. and had daily contact with many paternal relatives and extended family

15

members.  A.B. did not have any significant health issues and was developmentally on track.

Mother testified at the April 4, 2019 review hearing, and both parents asked the court to extend their services for another six months.  A.B.'s counsel asked the court to follow CFS's recommendation to terminate the parents' services, noting that the parents had already had around 12 months of services and had not completed their services despite repeated referrals.  County Counsel noted that Father was initially uncooperative with CFS and "extremely late" in participating in his services, and neither parent had completed a substance abuse program.

The court terminated the parents' services, set a section 366.26 hearing on July 29, 2019,[6] and authorized the parents to have joint supervised visits with A.B.  Again, neither parent asked the court to change A.B.'s placement.

E.  *The Parents' Section 388 Petitions and CFS's Further Reports*

On May 21, 2019, Father filed a section 388 petition seeking further reunification services and asking the court to vacate the section 366.26 hearing.  Father showed that he had completed his substance abuse program on May 1, 2019, after completing 28 of 35 group sessions.  Father was to continue with weekly group meetings, weekly counseling sessions, and weekly drug testing through his substance abuse program.  Father had also

---

[6] The parent filed notices of intent to file writ petitions in case No. E072542, challenging the April 4, 2019 order setting the section 366.26 hearing.  (Cal. Rules of Court, rules 8.450 to 8.452.)  The writ case was dismissed after the parents filed no issue statements, indicating there were no legal or factual issues upon which to base an extraordinary writ petition.

completed eight individual counseling sessions. His therapist reported he had been "making positive progress" and "gaining insight into [his] behaviors and experiences." Father's section 388 petition did not seek to modify A.B.'s placement with E.B.

In its July 23, 2019 section 366.26 report, CFS recommended adoption as A.B.'s permanent plan. A.B. "presented as a very happy little boy" and called E.B. "daddy." E.B. was committed to adopting A.B. E.B. owned a four-bedroom home he shared with A.B., another paternal uncle, and the paternal grandmother. A.B. was "always surrounded by family who love him and [were] committed to providing him a safe and loving home." CFS claimed the parents' supervised visits appeared to be detrimental to A.B. During visits, the parents were not interacting with A.B., were on their phones, were "cussing" and "making threats" to E.B., the family, a social worker, and "anyone else" who was involved with the case. Father was also threatening to kidnap A.B. and take him where he would never be found, such as Canada or Mexico.

On July 25, 2019, CFS filed a response to Father's petition, asking the court to deny it in part because Father had not completed his CFS-sponsored psychological evaluation, had not submitted to numerous random drug tests, tested positive for methamphetamines on March 12, 2018,[7] and positive for amphetamines on January 28, 2019. Father had completed his own psychological evaluation but had not authorized CFS to speak with or obtain any reports from his psychologist.

---

[7] Father's March 12, 2018 drug test specimen was retested on April 2, 2018, and the retest showed that the original test on March 12 was a "false positive."

17

On July 29, 2019, the court granted E.B.'s request to be appointed A.B.'s de facto parent. In court on July 29, A.B.'s counsel asked the court to find that the parents' visits were detrimental to A.B. and to suspend the visits pending the next hearing or order that the visits be "closely supervised at CFS only." County Counsel joined the request and asked the court to reduce the frequency of the visits from weekly to once or twice monthly. The court did not reduce the frequency of the visits but ordered them to be "closely monitored" and supervised only at CFS.

On August 6, 2019, Mother filed her own section 388 petition, seeking further reunification services, increased visitation, and to vacate the section 366.26 hearing. Mother adduced evidence that she had completed her entire case plan, including her counseling and substance abuse treatment program. A letter from Mother's substance abuse counselor stated that Mother had "excelled with the curriculum" and showed "the desire to build a healthy sober lifestyle." But the letter did not state when Mother had completed the program or include any information concerning Mother's drug testing or drug test results.

On September 27, 2019, CFS reported that the parents visited A.B. on July 31, August 12, and August 19; the visits went well and there were no concerns. Mother had a September 9 visit that also went well, and she was "very interactive" with A.B. Father had still not given CFS a copy of his psychological evaluation, despite three requests for it in August and September.

CFS filed opposition to Mother's petition on September 27, 2019. CFS noted that it had taken Mother eight months to complete a three-month substance abuse program;

Mother did not complete her second course of individual counseling until July 2019; Mother had not benefited from her counseling; and Mother had missed many drug tests. The letter from Mother's counselor did not state how many drug tests Mother either had taken or should have taken during her substance abuse program. Mother quit her job in July 2019, and was living with friends in Crestline, although she was still in a relationship with Father. Mother said she moved to Crestline in the hope that CFS would provide her with further services, and if she did not receive the services she would move back in with Father.

F. *The Evidentiary Hearing on the Parents' Section 388 Petitions (October 1, 2019)*

At an October 1 2019 evidentiary hearing, the parents testified in support of their section 388 petitions. Father testified that he completed his substance abuse program on April 28, 2019, along with his counseling, and he was currently in aftercare. He had never been diagnosed with bipolar disorder but suffered from depression, and through continued counseling he was learning "better methods" of dealing with his depression.

Father claimed he had not used any controlled substances since July 6, 2017, and had never used any controlled substances with Mother. He had drug tested several times since May 2019, but he did not have the test results. He denied having a current substance abuse problem. He did not authorize CFS to obtain a copy of his psychological evaluation, and he did not complete the CFS-sponsored psychological evaluation because he felt CFS evaluators were biased. He and Mother were still in a relationship but were not currently living together.

19

Mother testified that she had learned how not to place A.B. at risk and not to use drugs when she felt anxious or depressed. She signed up for her most recent substance abuse program in November 2018, and completed it in either July or August 2019. In her program she learned how to identify her substance abuse "triggers," how to remain sober, and live a healthy lifestyle. She had last used methamphetamine in March 2018, and acknowledged that she had an "ongoing" substance abuse problem. The court accepted the parties' stipulation that the parents had been consistent with their visits, that the visits went well, and that A.B. recognized the parents as "mommy" and "daddy."

In denying both petitions, the court noted that both parents appeared to be taking their "current programs" seriously but, given their history of "ongoing problems," they needed to show "a substantial period of both sobriety and stability" before the court could find a change in circumstances, and neither parent made that showing. The parents also failed to show that granting them additional services would serve A.B's best interests, given that A.B. had spent "the majority of his life" with E.B. and his need for permanency and stability was paramount. To show a substantial change in circumstances, the court said the parents would have to finish all of their aftercare, show their sobriety through consistent drug testing, find stable housing, and address Father's mental issues.

The court expressly found the parents' testimony not credible concerning the last time they used controlled substances. The court noted that Father's own psychological evaluation, which Father adduced at the hearing, indicated that he told his psychologist that he last used methamphetamine in the early 2000's, but this was inconsistent with

20

Father's testimony that he had been sober since July 6, 2017. The court found that both parents had minimized their own and each other's addiction issues and Father's mental health issues, and had unstable housing. Mother had been using methamphetamine "on and off" since she was 15 years old, had not been sober for a substantial period, and had taken nine months to complete her most recent 90-day substance abuse program.

G.  *The Section 366.26 Hearing (October 30, 2019)*

At the section 366.26 hearing on October 30, 2019, the court terminated parental rights and selected adoption as A.B.'s permanent plan. The court noted that three-year-old A.B. had been placed with E.B. for nearly two years, was thriving in E.B.'s care, and there were no apparent impediments to A.B.'s adoption. The court rejected the parents' requests to find that the parental benefit exception to adoption applied and to place A.B. in a long-term guardianship. The court found that neither parent occupied a parental role in A.B.'s life, given that A.B. looked to E.B. for his daily needs and the parents had never progressed beyond limited supervised visitation.

## III.  DISCUSSION

A.  *Father Has Forfeited His Recusal Claim Concerning CFS and County Counsel*

Father claims the juvenile court should have recused the entire offices of CFS and County Counsel from the case. We conclude that Father has not preserved this claim for review.

1.  Relevant Background

As discussed, in June 2018, Father withdrew his February 2018 motion to recuse the entire offices of CFS and County Counsel from A.B.'s case and to transfer the case to

21

another county. Father's new, court-appointed counsel withdrew the motion after Father's former privately retained counsel, Ms. Ross, declared a conflict of interest in representing both Father in A.B.'s case and E.B. in E.B.'s civil suit against the County. Thereafter, the court denied the more limited motion, by A.B.'s counsel, to screen from A.B.'s case any CFS social workers and supervisors who were parties or potential witnesses in E.B.'s suit against the County. (§ 16513.5.) In denying A.B.'s motion, the court noted that no party was claiming that anyone from CFS or County Counsel who was involved in the case had been biased in their handling of the case, and if any party raised any such claims the court would be "open to hearing about the specifics" of them.

In his withdrawn motion, Father claimed that E.B.'s pending civil suit against the County and CFS gave CFS and County Counsel a motive to remove A.B. from E.B.'s care based on false allegations against E.B. But that never occurred; A.B. remained placed with E.B. throughout A.B.'s case, E.B. became A.B.'s de facto parent, and CFS recommended that A.B. be adopted by E.B.

2. <u>Analysis</u>

Father now claims for the first time in this appeal that "the County would have been tempted to align itself" with E.B. in A.B.'s dependency case, not because E.B. "was a truthful historian about the parents or because adoption with [E.B.] was in the best interest" of A.B., but because the County had a financial interest in appeasing E.B. in order to mitigate the County's financial exposure to E.B. in E.B.'s pending civil suit against the County. Father argues the County had a financial interest in aligning itself with E.B. at the expense of treating Father unfairly in A.B.'s case. Father also argues

22

that, had CFS opposed placement of A.B. with E.B. or E.B.'s adoption of A.B., then E.B. could have had another retaliation claim against CFS.

As County Counsel observes, "Father is essentially seeking relief for the first time on appeal of an issue not submitted to the juvenile court for review." "It is axiomatic that arguments not raised in the trial court are forfeited on appeal." (*Kern County Dept. of Child Support Services v. Camacho* (2012) 209 Cal.App.4th 1028, 1038.) Father's claim in this appeal that the juvenile court should have recused the entire offices of CFS and County Counsel, based on the County's alleged financial conflict of interest involving E.B. was never presented to the juvenile court for its consideration in the first instance.[8] Thus, Father has forfeited his right to claim in this appeal that the court should have recused the entire offices of CFS and County Counsel from A.B.'s case.

B. *The Parents' Section 388 Petitions Were Properly Denied*

Section 388 allows a parent to petition the juvenile court to change, modify, or set aside a previous order of the juvenile court. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308-309.) To obtain the requested modification, the parent must show by a preponderance of the evidence that there has been either a change of circumstance or new evidence, and

---

[8] In his opening brief, Father mistakenly indicates that A.B.'s counsel moved the court to disqualify the entire offices of CFS and County Counsel from A.B.'s case. And, in his reply brief, Father mistakenly indicates that the court ruled on this question and that all parties had the opportunity to argue their positions and did so. Not so. Neither Father, A.B.'s counsel, nor any other party ever moved forward with a motion to recuse the entire offices of CFS and County Counsel from A.B.'s case. Rather, as discussed, the court only ruled on and denied A.B.'s motion to screen particular CFS employees from the case, not to recuse the entire offices of CFS and County Counsel from the case.

that the requested modification is in the best interests of the child. (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

We review the grant or denial of a section 388 petition for an abuse of discretion and will not disturb the court's ruling unless an abuse discretion is clearly shown. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.) Both parents claim the juvenile court abused its discretion in denying their section 388 petitions for further reunification services. We find no abuse of discretion in the court's denial of either petition.

Father claims he showed by "abundant evidence" that he "turned his life around" in the time before the filing of and the hearing on his petition; thus, he showed a change of circumstance. Additionally, Father claims he showed that granting him further services was in A.B.'s best interests, because his visits with A.B. went well and A.B. was happy to see him. The juvenile court reasonably concluded, however, that Father failed to show either changed circumstance or best interests.

As the court pointed out in denying both parents' petitions, neither parent showed that they had been clean and sober for a substantial period of time given the length of their substance abuse histories. The court found each parent's testimony not credible concerning when they last used methamphetamine. Indeed, neither parent adduced any evidence that they had tested negative for controlled substances for a sustained or substantial period before the October 1, 2019 hearing on their petitions. Father also did not show that he had addressed his longstanding mental health issues, and neither parent had stable housing.

The court also reasonably concluded that granting reunification services to either parent would not serve the best interests of A.B.  After a parent's reunification services are terminated, a parent's interest in the care, custody, and companionship of their child is no longer paramount and the focus shifts to the child's need for permanency and stability.  (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

By the time of the October 1, 2019 hearing, A.B. was over three years old, and had been placed with A.B. since January 23, 2018.  As the court found, granting either parent additional services would have meant delaying A.B.'s permanency while "waiting for the parents to possibly make a substantial change in circumstances."  Given the parents' failure to show their continued sobriety through consistent drug testing at the time of the October 1, 2019 hearing, despite their having had access to CFS-sponsored substance abuse and other services since July 2017, the court reasonably concluded that it was not in A.B.'s best interests to delay his permanency while granting the parents additional services.

Mother claims the court unreasonably faulted her for not demonstrating a sustained period of sobriety following her completion of her substance abuse program in July or August of 2019.  Mother points out that she completed two parenting classes, two rounds of individual counseling, and a substance abuse program—all of the required components of her case plan.  She argues that, in denying her petition, the court misconstrued "the purpose" of section 388, which is to provide an " 'escape mechanism' when parents complete a reformation in the short, final period" following the termination of their services and before their parental rights are terminated.  (*In re Kimberly F.* (1997)

25

56 Cal.App.4th 519, 528.)  The court did not misconstrue the purpose of section 388. Rather, it properly considered A.B.'s paramount need for stability and permanency in concluding that his best interests would not be served by granting either parent additional services and additional time, to show they could safely reunite with A.B.  Despite the parents' completion of additional services, as demonstrated in their petitions, neither had progressed beyond supervised visits by October 1, 2019, six months after their services were terminated.  Further, given the parents' long term substance abuse histories, the court reasonably concluded that their short period of reported recovery was insufficient to demonstrate changed circumstances.

C. *The Court Properly Determined That the Parental Benefit Exception Did Not Apply*

Both parents claim the court erroneously concluded that the parental benefit exception to the adoption preference did not apply, and that the court should have instead ordered a permanent plan of legal guardianship.  Again, we find no abuse of discretion.

1. Applicable Legal Principles

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child.  (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.)  These include (1) adoption, necessitating termination of parental rights, (2) guardianship, or (3) long-term foster care.  (§ 366.26, subds. (c)(1), (4)(A); *In re J.C.* (2014) 226 Cal.App.4th 503, 528.)  If the court finds the child is adoptable, it " 'shall terminate parental rights' " and select adoption as the child's permanent plan, unless it finds that one or more exceptions to the statutory adoption preference applies.  (*In re K.P.*, at p. 620; see

§ 366.26, subd. (c)(1)(A)-(B).)  A parent has the burden of showing that an exception applies.  (*In re Scott B*. (2010) 188 Cal.App.4th 452, 469.)

The parental benefit exception applies when the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i); see *In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)  To show that the child would benefit from continuing the relationship with the parent, the parent "must do more than demonstrate . . . an emotional bond with the child"; the parent "must show that he or she occupies a 'parental role' in the child's life."  (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)

The parent must also show that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

" 'The balancing of [these] competing considerations must be performed on a case-by-case basis and take into account many variables, including the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.

[Citation.] When the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent/child relationship, the court should order adoption.' [Citation.]" (*In re Jasmine D.* (2000) 78 Cal.App.4th1339, 1349-1350.) This rule applies unless "severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be *greatly harmed*." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, italics added.)

### 2. Standard of Review

California appellate courts are divided over the appropriate standard of review of an order applying the parental benefit exception. Some courts have applied the substantial evidence standard; others have applied the abuse of discretion standard or a combination of the substantial evidence and abuse of discretion standards; and still others have required evidence compelling a finding in favor of the parent on the beneficial relationship issue as a matter of law. (See, e.g., *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947 [substantial evidence]; *In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351 [abuse of discretion]; *In re Collin E.* (2018) 25 Cal.App.5th 647, 663, [combination]; *In re Breanna S.* (2017) 8 Cal.App.5th 636, 647 [matter of law].)

Our Supreme Court has granted review to determine the appropriate standard that governs appellate review of the application of the parental benefit exception. (*In re Caden C.* (2019) 34 Cal.App.5th 87, 106, review granted July 24, 2019, S255839.) Here, we conclude that, under any applicable standard, the court properly determined that the parental benefit exception did not apply to either parent's relationship with A.B.

28

3. Analysis

The court's refusal to apply the parental benefit exception was proper for several reasons. First, there was no evidence that A.B. would be greatly harmed by the termination of parental rights and the severing of any positive emotional attachment he may have had with either parent. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) At the time of the section 366.26 hearing on October 30, 2019, A.B. was over three years old and had been living with E.B. since January 23, 2018, when he was around 17 months old. A.B. was thriving in E.B.'s care and looked to E.B. for his daily needs. Although A.B. recognized the parents as "mommy" and "daddy," there was no indication that severing A.B.'s relationship with the parents would be detrimental to or greatly harm A.B.

Second, the court reasonably found that neither parent occupied a parental role in A.B.'s life. (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) Although the parties stipulated that the parents consistently visited A.B. and that the visits went well, the court reasonably concluded, based on CFS's reports, that A.B. looked to E.B. for his daily needs. As the court also noted, the parents never progressed beyond limited supervised visitation. Third and lastly, neither parent showed that their parent-child relationship with A.B. promoted A.B.'s well-being to such a degree as to outweigh the well-being that A.B. would gain in a permanent home with new, adoptive parents. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Thus, we conclude that the juvenile court properly determined that the parental benefit exception did not apply.

29

## IV.   DISPOSITION

The October 1, 2019 orders denying the parents' section 388 petitions for further services, and the October 30, 2019 section 366.26 orders terminating parental rights and selecting adoption as A.B.'s permanent plan, are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS_____

J.

We concur:

MILLER_____

Acting P. J.

RAPHAEL_____

J.